## THORNTON v. THE STATE.

To constitute one a principal in the second degree, he must not only be present when the crime is committed, but must aid and abet the actual perpetrator of the crime. One who is present when a crime is committed, but neither assists in its commission nor shares in the criminal intent of its perpetrator, is not guilty as a principal in the second degree.

*Argued January 19, — Decided February 12, 1904.*

Indictment for murder. Before Judge Butt. Chattahoochee superior court. December 21, 1903.

*J. B. Hudson, C. C. Minter, Graham Forrester,* and *Hatcher & Carson,* for plaintiff in error. *John C. Hart, attorney-general,* and *S. P. Gilbert, solicitor-general,* contra.

FISH, P. J. Dan Amos and Wilborn Thornton were indicted for the murder of Sam Gordon. In one count they were both charged as principals, and in another count Thornton was charged as principal in the second degree. Upon the trial of Thornton it appeared that Amos, Thornton, Gordon, and others attended a dance at the house of one Wilson, in Chattahoochee county; and that, some time between ten and one o'clock of the night of the dance, Thornton loaned Amos a pistol. Ben Gordon, a witness for the State, testified: "I saw the defendant [Thornton] give Amos something. Amos came up to him and told him he wanted to get his rip-rap, meaning his pistol. Said Sam Gordon had been taking money away from him when they met, and if he took any more he was going to kill him. Thornton told him to take it and kill him if he took any more. He gave him his pistol." It appeared that Dan Amos shot Sam Gordon next morning about seven o'clock, in an old field, about one hundred yards from Wilson's house. Ben Gordon further testified: "When shooting took place Thornton and Amos were pretty close together, about five feet, talking. Dan told Sam he owed him a dime; he was standing, talking, and Sam was sitting down. Sam told him he didn't owe him any dime; he said, 'Yes, you do.' Sam says 'If I owe you a dime, I will pay your dime; and I am going to make some of you boys shoot me with these little guns you are carrying around here.' Sam had no weapon in his hand, and done nothing to Amos when he shot him. Amos was standing

up. Thornton gave Amos the pistol before day, can't say exactly what time, the morning before day he was shot. It was about a hundred yards from the place he gave him the pistol to where killing took place. . . I do not say now that they played cards that night before they went out in the field and Sam won their money; they didn't do it, and they didn't play cards out in the field next morning; they had just got out there, and they were not playing at night. . . They were sitting down, talking, did not have anything with them, had no cards, no dice, just sitting around. I was not sitting down. Johnnie Gordon and Wilborn Thornton were there. The fuss started between my brother and Dan, about a dime Dan said he owed him; didn't say about what. . . Wasn't any row going on there at all; everybody seemed to be in good humor until Dan told my brother that; and the first I knew of it was the shooting. . . I told him [Sam Gordon] about Dan borrowing the pistol from Wilborn. Arthur Denson, a witness for the State, testified: " Was at Wilson's house where he [Amos] got the pistol. Was out doors, and Dan Luther [Amos] came out, and Wilborn he came out, too, and Dan Luther says, ' Wilborn, lend me your rip-rap;' he says, ' Sam Gordon has been robbing me in every game I get into with him, and if he robs me to-night I will kill him.' So he let him have it. Wilborn says, ' Take it and kill the dam son of a bitch if he robs you.' Wilborn was present, standing out there when this fellow shot him. I don't know how close he was standing to him. I was not close up myself. . . I was out there when the difficulty occurred. I was going out there, but hadn't got there good, before the pistol fired. I don't know how the difficulty started. . . . Couldn't say what the trouble was about. I was not there and didn't see it. All I saw taking a hand in it was Dan shooting and the other man fell and then Dan run. Dan held pistol on him until Sam fell. I didn't see anybody else do anything except scatter. . . I could not say what they were doing, did not see them. Some were standing up, and some sitting down. . . I believe I saw one card; after the difficulty I saw one; but what they were doing I don't know. I say I saw the trey of clubs where they had been sitting around, but what they were doing I could not say. . . Did not see Dan Amos playing cards." Thornton was found guilty and sentenced to the penitentiary for life.

He moved for a new trial upon various grounds, one of which was that the verdict was contrary to the evidence and without evidence to support it. A new trial was refused, and he excepted.

" A person may be principal in an offense in two degrees. A principal in the first degree is the actor or absolute perpetrator of the crime. A principal in the second degree is he who is present, aiding and abetting the act to be done; which presence need not always be an actual, immediate standing by, within sight or hearing of the act; but there may be also a constructive presence, as when one commits a robbery, or murder, or other crime, and another keeps watch or guard at some convenient distance." Penal Code, § 42. Thornton was not a principal in the first degree, as he was not the actor or absolute perpetrator of the crime. Was he, under the evidence, guilty as principal in the second degree? Under the evidence for the State, he was present at the commission of the crime; but mere presence is not sufficient to render one an aider and abetter. *Lowery* v. *State,* 72 *Ga.* 649. Though it has been held that if special circumstances or relations create a duty to interfere, mere inactive presence may amount to a criminal participation. 2 Am. & Eng. Enc. L. 33. And it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. Ib. For one to be guilty as principal in the second degree, it is essential that he share in the criminal intent of the principal in the first degree; the same criminal intent must exist in the minds of both. Thus, where A told B, who was going to a house fifty yards distant, to get a pistol in a certain place in the house and shoot C, who was in the house, and promised B a reward for so doing, and B did as A directed, while A remained at the place where these instructions were given, A was a principal in the second degree. *Collins* v. *State,* 88 *Ga.* 347. And where A, B, and C were in a room together, and A, having furnished B with a knife, told him to stab C, and B then and there did so, A was principal in the second degree to the crime thus committed. *Washington* v. *State,* 68 *Ga.* 570. In these cases the aider and abetter had the same criminal intent as the actual perpetrator of the crime. In *Brown* v. *State,* 28 *Ga.* 200, it was held: "Presence and participation in the act of killing a human being is not

evidence of consent and concurrence in the perpetration of the act, by a defendant charged with aiding and abetting in the killing, unless he had a felonious design or participated in the felonious design of the person killing. If the person charged with murder in the first degree commit the assault on the deceased with a deadly weapon, but his intention to assault him with a deadly weapon was unknown to the person charged in the same indictment as principal in the second degree, and he intended to participate in an assault and battery only, and in no design to kill, he is guilty of manslaughter only."

If Thornton had given his pistol to Amos, with instructions or advice to kill Sam Gordon with it, and Amos had done so when Thornton was present, and nothing more had appeared, then Thornton would have been guilty as principal in the second degree. The evidence for the State shows, however, that when Thornton loaned his pistol to Amos he told, or advised, him to kill Gordon with it, if he should again rob Amos at cards. His advice or instruction to kill Gordon was, therefore, conditional, or dependent upon the event that Gordon should again rob Amos at cards. Even granting that there was enough in the evidence to authorize the jury to infer that Amos and Gordon had, subsequently to the loan of the pistol, engaged in playing cards, we think there is nothing in the evidence from which the jury could fairly infer that Gordon had robbed Amos in such a game, or that the killing was in consequence of such robbery. Of course we do not use the words "robbed" and "robbery" here in their limited legal sense, but as including cheating in a game of cards played for money. The evidence shows that Amos stated to Gordon that he owed him a dime. This Gordon denied, but paid it, saying at the time that he would make some of them shoot him; whereupon Amos immediately shot and killed him. From these facts we do not think it can be successfully contended that the evidence shows that, at the time of the homicide, there was in the mind of Thornton the same criminal intent and felonious design that was in the mind of Amos. The common intent and purpose in the minds of both, at the time that Thornton furnished Amos with the pistol, was that Amos should kill Gordon if the latter should again rob him at cards. There is nothing in the evidence to show, or to authorize the jury in finding, that Thorn-

ton ever had any other criminal intent. If Amos, after procuring the pistol from Thornton, had casually met Gordon and immediately shot him, without any provocation whatever, certainly Thornton would not have been guilty of murder as a principal in the second degree, although he had been present on the occasion of the homicide, if he did nothing then to aid or abet the commission of the crime. It follows from what we have said that the court should have granted a new trial, upon the ground that there was no evidence to support the verdict.

*Judgment reversed.* *All the Justices concur, except Simmons, C. J., absent.*